# CHARLESTON.

LUCAS *v.* SMITHFIELD, C. & H. F. TURNPIKE CO.

(LUCAS, P., Absent.)

Submitted February 3, 1892.—Decided April 9, 1892.

1. TURNPIKE — COVENANTS RUNNING WITH THE LAND — EASEMENTS BY PRESCRIPTION.

In the year 1830 or 1831 a turnpike company constructed a turnpike road through the lands of W. L., of Jefferson county, then in Virginia, taking rock from quarries on the adjacent lands of said W. L. to use in constructing the same; and no proceedings of condemnation appear to have been instituted against the lands of said W. L., although the lands of twenty five others were condemned for the purpose of said road by said company in said county. In July, 1850, a letter was received by W. L., from the president of said company, recognizing the right of his tenant, when on his business, to pass the toll gates of said company free; and said W. L. and his family and servants passed through said toll gates at pleasure, free of toll, until the death of W. L., which occurred on the 26th of August, 1877. By the will of W. L. the land through which said road runs for a mile, and on which W. L. resided, was devised to his son D. B. L., with all the privileges and appurtenances thereto belonging; and said D. B. L. exercised the same privileges, with reference to said road, for eleven years after his father's death, when toll was demanded of him by the gate keepers on said road. *Held,* that under the circumstances of this case the law will presume that a contract was made between said W. L. and said company, of such a character as to constitute a covenant running with the land, at the time said road was constructed, for the passage of W. L., his family and tenants, over said road, toll free.

2. TURNPIKES — COVENANTS RUNNING WITH THE LAND — EASEMENTS BY PRESCRIPTION.

That said W. L., having enjoyed this easement free of toll for

forty six years, peaceably, notoriously, adversely, continuously, and uninterruptedly, as a matter of right, he and his family, his servants and his tenants (when on his business) were entitled by prescription to the enjoyment of the same.

3. Turnpikes — Covenants Running with the Land — Easements by Prescription.

That his son D. B. L., having enjoyed this easement free of toll, under claim of right, for more than ten years after the death of his father, and having acquired said land as aforesaid, was entitled to the enjoyment of said easement free of toll, and could restrain the collection of the same by injunction.

*Okey Johnson* for appellant cited Code, c. 125, s. 49; Id., c. 134, s. 4 ; 25 W. Va. 394 ; 14 Gratt. 131 ; 10 W. Va. 41 ; 16 W. Va. 685 ; 34 W. Va. 457 ; Id. 474 ; High Inj. § 886 ; 17 Metc. 179 ; 17 W. Va. 396 ; 27 Gratt. 892 ; 2 Eden Inj. 273 ; Turn. Law R. C. (1819) p. 218, s. 18 ; Code (1887), c. 56, s. 9 ; Ell. Roads, &c. 71 ; Code (1819) p. 211 ; 6 Mod. 3 ; Code (1819) c. 236, s. 7 ; 20 Pa. St. 185 ; 5 S. E. Rep. 241 ; 3 East 294 ; Id. 116, 117 ; 101 U. S. 543 ; 117 U. S. 648 ; 105 U. S. 614 ; 16 Pet. 327 ; 1 L. R. A. 198 ; 17 W. Va. 427 ; Godd. Ease. (Ben. Ed.) 133 ; Washb. Ease. 148, 149 ; Code, c. 104, s. 1 ; 5 W. Va. 325 ; 16 W. Va. 443 ; Busw. Lim. &c. § 243 ; 11 W. Va. 94 ; 6 W. Va. 367 ; 18 W. Va. 454 ; 21 Gratt. 6 ; 6 Am. & Eng. Ency. Law 140 & n.; 79 Ala. 288 ; 110 Ill. 264 ; 1 Greenl. §§ 114, 141 ; Code (1819) p. 217, s. 16 ; 1 Greenl. Ev. § 109 ; Id. 113 ; Pol. & W. Poss. 36 ; Co. Litt. 113 b., 114 a.; 8 Barb. 612.

*B. Trapnell* for appellee cited 16 Pick. 173 ; Id. 183 ; 9 Am. & Eng. Ency. Law 362, 364 ; Gale Ease. 5 ; 6 Am. & Eng. Ency. Law 142 ; Id. 146 ; 2 Greenl. Ev. § 539, note a.; 7 Conn. 214 ; 2 Washb. Real Prop. 262, 263 ; 67 Ala. 221 ; 14 Wall. 120 ; 32 Gratt. 27 ; 33 O. St 393 ; 75 Va. 436 ; 24 W. Va. 238 ; 10 Conn. 375 ; 5 Wall. 599.

English, Judge:

At the October rules held for the Circuit Court of the county of Jefferson in 1888, Daniel B. Lucas filed his bill in equity against the Smithfield, Charlestown & Harper's Ferry Turnpike Company, in which he alleged that he was the devisee of the late William Lucas in the month of August, 1877, who left a will which was duly probated,

whereby he devised his homestead, called "Rion Hall," and three hundred acres thereto attached, to the plaintiff, who took possession of the same and has held it ever since; that the turnpike road of the defendant passed through said "Rion Hall" tract, and that there was and is appurtenant to said tract as an easement, right, privilege and appurtenance a right of way over said defendant's turnpike road free of toll for the owner of said tract, his family, servants, tenants and employes on said tract under a contract, agreement or understanding with said company about the time of the construction of its road through said tract, which has been fully executed for more than fifty years; that the consideration for said right contracted to be paid and actually paid was the right of way through said tract and a very large amount of stone taken by said company from two or more quarries on said tract, for which no other compensation was ever paid, and in consideration of which the said perpetual exemption from toll was granted, as complainant avers; that his father, said William Lucas, claimed and enjoyed this right, thus purchased, from the time of the construction of said road, about the year 1834, quietly, peaceably, notoriously, adversely, continuously and uninterruptedly up to the time of his death in August, 1877, and that since that time the complainant, as his devisee and successor, had enjoyed the same right in the same manner up to the time of the grievances hereinafter set forth; that about the 1st of June, 1888, he was, greatly to his astonishment, called upon by one Mrs. Ann Burkit, a tollgate keeper and agent of defendant, at the gate one mile east of Charlestown to pay toll, and there was exhibited to him an order of the company prohibiting all persons from passing through without paying toll, and said Burkit stated that she had been instructed by the company that said order was intended to apply to and was to be enforced against complainant, and that toll was to be charged against and exacted from him precisely as against and from the public generally; that in reply to a letter addressed by him to the president of said company making inquiry in regard to the matter, said president replied in person that said gatekeeper had acted under instructions, and that the

company proposed to exact toll from him as from other persons, and to enforce the same in the manner prescribed by law, as against other persons; that about the first day of August, 1888, he was stopped at said gate by said Burkit, and an itemized account for the month of July, just passed, of toll charged against him was presented, and was informed that she was instructed by the company to insist thereafter upon the payment of the toll in cash before each passage through the gate by complainant, or that the gate was to be closed upon complainant, and his passage prohibited and obstructed; that he was engaged in the practice of law, his office being in Charlestown, and his residence on said "Rion Hall" tract, and he was required by his business to pass this gate daily, in going to and returning from his office; that at the time he was interrupted, as aforesaid, he was on his way to his office and to the court-house; that the court was then in session, and he was engaged in the trial of an important case and there was no other road to the court-house or his office except a dirt road from four to five miles out of his way, and that to intercept his passage at the gate named would work an irreparable damage to complainant, and such peremptory interception by said Burkit as agent, and by direction of defendant, was only withheld and suspended for a few days in order to give complainant an opportunity to apply for an injunction, and that said gatekeeper informed plaintiff that she was in danger of losing her situation by reason of said indulgence; that the sums demanded of complainant were so small that there could be no appeal from a justice's jurisdiction, should complainant seek to recover them back, and a multiplicity of actions would necessarily follow any attempt to seek redress at law for interception of his passage, and, having no adequate remedy at law, he prayed that the defendant, its officers, servant and agents might be perpetually enjoined from interferring with complainant in the exercise and enjoyment of his rights, as thereinbefore were set forth, to travel on said road free of toll, to the extent above claimed; that his rights might be established and specifically enforced, and for general relief. An injunction was awarded as prayed for.

By the will of said William Lucas, a copy of which was exhibited with the bill, it appears that said "Rion Hall," with three hundred acres of land attached, was devised to the complainant, with all the privileges and appurtenances thereto properly belonging or appertaining.

The defendant demurred to the plaintiff's bill, and also answered the same, putting in issue all of the material allegations of the bill. Several depositions were taken by both plaintiff and defendant, and several affidavits were also filed, and on the 28th day of February, 1890, a decree was rendered in said cause, dissolving said injunction, and on the 8th day of December, 1890, another decree was entered therein, dismissing the plaintiff's bill; and from these decrees the plaintiff applied for and obtained this appeal, which action of the court is assigned as error.

It appears from the evidence in the case that the defendant turnpike company's road was built from Charlestown to Harper's Ferry, passing through the lands of the late William Lucas, in the years 1830 and 1831, and by the terms of its charter it was made subject to the provisions of the act entitled "An act prescribing certain general regulations for the incorporation of turnpike companies," provided that the said company should not be compelled to make the said road more than fifty feet wide, or the summer or side roads more than fifteen feet each; and section 16 of chapter 234, 2 Code 1819, which contains said act, prescribing certain general regulations for the incorporation of turnpike companies, provides that "in consideration of the expenses which the proprietors will incur in opening, improving and repairing the said road, with all the tolls and profits, shall be and the same is hereby vested in the respective proprietors forever, in proportion to their respective shares."

It appears also that this turnpike road was located through the lands of said William Lucas on the site of an old State road which was thirty feet in width. So that, in constructing said turnpike in accordance with its charter, it was necessary to widen the old road twenty feet. The road passed through the lands of said William Lucas for one mile, taking a strip of his land twenty feet in width, an area of about two acres.

The testimony of the witnesses Colbert, Payne, and Lucas shows that said William Lucas claimed, that in consideration of a free right of way through his lands rock furnished by him for the use of the road and also labor furnished in its construction he was entitled to pass over said road toll free. Proof of these declarations was excepted to by counsel for the defendant as incompetent evidence. Were they, under the circumstances of this case, such evidence as should have been received and considered?

1 Greenl. Ev. § 109, says: "In regard to the declarations of persons in possession of land, explanatory of the character of their possession, there has been some difference of opinion, but it is now well settled that declarations in disparagement of the title of the declarant are admissible as original evidence. Possession is *prima facie* evidence of seisin in fee simple; and the declaration of the possessor that he is tenant to another, it is said, makes most strongly against his own interest, and therefore is admissible. But no reason is perceived why every declaration accompanying the act of possession, whether in disparagement of the claimant's title or otherwise qualifying his possession, if made in good faith, should not be received as a part of the *res gestæ*, leaving its effect to be governed by other rules of evidence."

So, also, 1 Whart. Ev. § 203, says: "Evidence of the declarations of a party taking possession of property may be received as explaining the nature or limitations of such possession." And in section 264 he says: "What is done is part of the *res gestæ*, as much as what is said."

The declarations proven by the testimony to have been made by William Lucas were explanatory of his acts in daily passing over this road to and from the town of Charles Town, with his teams and family and servants, without payment of toll on said turnpike road; and every time he or one of his family or servants passed over said road without paying toll, and without toll being demanded of them, during the forty six years of his life, which transpired between the date of the construction of said turnpike road and his death, it was a mute assertion on his part, and concession on the part of the agents of the road, of his right to pass toll free over the same.

Then, again, in the absence of these statements and declarations made by said William Lucas while exercising and enjoying the privilege of passing through the toll gates on said turnpike road free of toll, a strong presumption is raised in favor of the fact that in consideration of a free right of way, and rock and other material taken from the lands of said Lucas by said company, the right of free passage over said road to said Lucas, his family and servants, was granted, from the fact that, out of twenty five condemnation proceedings instituted and prosecuted by said company against the lands of different individuals along the line of said road, there appears to have been none against the lands of said William Lucas. Neither does any deed or agreement between said Lucas and said company appear upon the records of said county.

Elliott, Roads & S. p. 71, lays down the doctrine that "the right to toll generally may be waived by contract;" and in the case of *Com.* v. *Allegheny Bridge Co.*, 20 Pa. St. 185, it was held that it was not ground of forfeiture of the charter of a bridge company that less tolls are charged than are authorized by law. The tolls may be commuted for an annual sum, if the charter do not forbid it, and if done with an honest purpose.

And in the case of *Park* v. *Turnpike Co.*, decided in 1888 in the Court of Appeals of Kentucky, and reported in Book 1, Lawy. Rep. Ann. 198 (9 S. W. Rep. 252) the facts presented are very similar to those in the case at bar; and section 1 of the syllabus reads as follows: "A turnpike company to which plaintiff orally sold land in consideration of the right to himself and family to pass perpetually through certain tollgates free of charge, which right he exercised for over fifteen years, can not rescind the contract because not in writing." That one who purchased all the stock of a turnpike company can not repudiate a contract previously made giving to a certain family free passage perpetually; and the fact that his family had increased, could make no difference with the question of the right of the party to rescind.

The court, in its opinion, says: "The corporation has been in the undisputed use and possession of his land un-

der the parol contract for a period exceeding fifteen years, while the appellant has continued to exercise his rights and privileges under it for the same period. It is now too late to surrender a title thus acquired by rescinding the contract, and tendering back to the appellant the possession and use of what is now the property of the turnpike company. If the appellant had instituted his action against the company for the possession of his land on the idea that the contract was by parol, or there was no written order from the board authorizing the purchase, it is manifest no recovery could have been had by him."

Whatever may have been the consideration paid by said William Lucas for the privilege of passing over said road, to be exercised by himself and his tenants when on his business, the letter dated July 31, 1850, signed by John Yates, the president of said company, and addressed to said William Lucas twenty seven years before his death, clearly recognized such right. It is clearly shown by the testimony of the plaintiff that he and his brother went to school near the town of Charlestown, passing twice a day, commencing in the year 1847, through the tollgate now kept by said Burkit, and no toll was either paid or demanded, and that from 1847 to the date of said William Lucas' death, in 1877, no toll was paid by any of the family, servants, tenants, or employes living on said land; that this free passage was claimed as a right, and acquiesed in as such by the company and its toll keepers."

And the fact that the privilege of passing said tollgates free was accorded to the tenants occupying the lands of said William Lucas, and to the members of his family, tends very strongly to show that this privilege was not a mere easement in gross, as we find that it is said in 6 Amer. & Eng. Enc. Law, p. 140, that "an easement in gross is attached to the person alone, and can not be assigned to another."

Returning again to the question as to whether, under all the circumstances of this case, we must presume that a contract was entered into between the said William Lucas and said turnpike company, we find that, in a court of equity, it is not regarded as material that such contract should be by

deed, as a condition precedent to its running with the land.

In support of this proposition we find that in the case of *Lydick* v. *Railroad Co.*, 17 W. Va. 427, which was exhaustively considered by the court, it was held (second point of syllabus) that "a parol contract, whatever is its character, · can not, at law, run with land; but if a parol contract is of such a character that it would, if it were a covenant, run with the land, and be a covenant real, such parol contract will be regarded by a court of equity as running with the land, and it will, at the instance of the party who owns the land and has acquired it under the covenantee, whether he holds the legal or equitable title, enforce specifically such contract."

The facts in that case were as follows: A right of way through land was granted to the railroad company, and in the deed, as a consideration for such grant, the railroad company covenanted with the grantor, his heirs and assigns, to build and forever maintain a switch from said railroad to a mill on the land for the use of said land; and it was held that this was a covenant real, that ran with the mill, and it was also held, in the seventh point of syllabus, that, "if such grant of a right of way and contract for such switch were only verbal, such contract would in a court of equity be regarded as running with the mill, and its specific performance would be enforced in favor of the future owner of the mill, holding title, legal or equitable, under the original covenantee."

Counsel for the appellee seeks in his argument to show that a turnpike road is to be regarded as a public easement, and not as the owner of the land over which it passes, and therefore incapable of supporting an easement; but, as we have seen, under the statute in Virginia (section 16, c. 234, 2 Code 1819) it is provided that "in consideration of the expenses the proprietors will incur in opening, improving, and repairing the said road, with all the tolls and profits, shall be, and the same is hereby, vested in the respective proprietors forever, in proportion to their respective shares."

If, then, the company is the owner of the road, and entitled to the tolls, why might they not pay for right of way

and material for constructing said road, by granting the right of passing toll free to the owners of land through which said right of way and from which said material are obtained? There is nothing in the letter or policy of the law forbidding.

That such a contract. was made between said William Lucas and said company is clearly shown by the conduct of said William Lucas, his family, tenants, and servants, in passing through the tollgates during his lifetime, which continued for forty six years after said road was construct-ed, and by the same course being continued by his son, his family and his tenants, for eleven years after the death of his father; said right during all that time being acquiesced in by the collectors of toll on said road, and clearly recognized by the president of said road in his letter to said William Lucas, in which he says, in speaking of the tenant, "when he is on your business, we allow the claim."

This letter, it will be remembered, was written twenty seven years before the death of said William Lucas, and we find that Angell on Highways, on page 486 (3d Ed) says, "Individuals or the inhabitants of a particular district who have for more than twenty years been permitted to pass a turnpike gate toll free may, it has been held, prescribe for a right so to pass," citing numerous authorities.

Under the word "prescription," Webster, in giving the legal meaning, quotes from Bacon as follows: "A prescribing for title; the claim of title to a thing by virtue of immemorial use and enjoyment; the right or title acquired by possession had during the time and in the manner fixed by law."

Goddard on the Law of Easements (page 134) says: "Prescription is described by Mr. Justice Blackstone as meaning, at common law, a mode of acquiring real property, when a man could show no other title to what he claimed than that he and those under whom he claimed had immemorially used to enjoy it. The reason why the law allowed a title to be thus acquired is that if a man had (to use an old and familiar phrase) enjoyed an easement from time whereof the memory of man runneth not to the

contrary uninterruptedly—that is, without dispute—a presumption would naturally arise that he had a right to that easement which the owner of the servient tenement could not legally dispute; for no man would suffer another to enjoy an easement in his land if he could help it, an easement being a burden necessarily detrimental to his estate." And on the next page, said author says: "And, without minutely stating here the local statutes of limitations as to adverse user, it may be safely asserted that no less period will suffice, and no greater will be required, in fixing the requisite length of enjoyment to gain a right to an easement in land by prescription than to acquire the land itself by adverse occupation. This element of duration is therefore comparatively simple."

The demurrer filed by counsel for defendant was not insisted on in argument, and, if it had been, we think the cases cited by counsel for the plaintiff, viz., High, Inj. § 886; *Shipley* v. *Caples*, 17 Md. 179; *Mason* v. *Bridge Co.*, 17 W. Va. 396; *Berkeley* v. *Smith*, 27 Gratt. 892; and Eden Inj. 237—clearly show that the plaintiff is in the proper forum.

That there was a covenant between the said William Lucas and said company is fairly to be presumed from the conduct of the parties for so many years; and, as we have seen, it is immaterial whether the contract was verbal or in writing, since the circumstances clearly indicate that the contract was of such a character as to constitute it a covenant running with the land. Had such not been the case, William Lucas, and his family and his servants and tenants, would never have been allowed for so many years to pass over said road free of toll.

Applying the law which we have quoted to the facts proven in the case, our conclusion is that we are bound to presume that said William Lucas exercised said right, not as an easement in gross, but under a covenant entered into at the time of the construction of said road, for a valuable consideration, and that said covenant was not merely personal, but ran with the land; that, as contended by counsel for the appellant, said easement had ripened into an indefeasible prescriptive right many years before his death, and

that the plaintiff took said land under the will of his father, with all the privileges and appurtenances thereto properly belonging or appertaining, including the easement aforesaid.

For these reasons the decrees complained of must be reversed, and, it appearing that the plaintiff was entitled to the relief prayed for, this Court proceeding to render such decree as should have been rendered, it is ordered that said injunction be perpetuated; and the appellee must pay the costs of this appeal.

REVERSED.